Case Numbers 22-26-68 and 23-62-75 United States v. Singh Case Numbers 22-26-68 and 23-62-75 United States v. Singh Case Numbers 22-26-68 and 23-62-75 United States v. Singh Case Numbers 22-26-68 and 23-62-75 United States v. Singh Mr. Singh and his associates, Mr. Mandeep and Rajpreet, operated a group of companies jointly which had the business of acquiring iPhones in the United States using credit cards, principally American Express, and shipping those iPhones overseas for resale. They received payment back from their customers, paid their American Express bills, and the process continued. And the process continued, as the record showed in this case, for a number of years involving over $109 million in transactions. Everything went smoothly. Occasionally, there were problems with timing of payments, but those were always worked out between the creditor and the companies. They went on smoothly until the end of 2017, beginning of 2018, in which the principal customer at that time overseas stopped making timely payments to Jasminder, Mandeep, and Rajpreet and their companies. At that point in time, they began falling behind. They fell behind. What's critically important here is that they continued to make payments. They made payments of over $3 million from the receipts they got. And the evidence showed that as they received the receipts from overseas, they made payments. There was some intercompany transactions, but nothing was done in a way which was designed to hide its true nature of these transactions. There's the transactions in January 2018 where they initiated a payment to American Express and then depleted the account before the payments could clear, right? Your Honor, that's true. There was that payment that was made, but again, the money all transferred... So why isn't there evidence that Jasminder did intend to defraud American Express? I'm sorry, Your Honor. Why isn't there evidence that there was an intent to defraud American Express? Well, Your Honor, the money was moved within their own accounts. The government's forensic accountant testified that it was easy to follow this money. Right, he wants to fix a problem with American Express. He says, I'm going to pay you back. American Express checks to make sure they have money in the account. The other bank confirms it, and before the payment could clear, he depletes the account, right? Yes, Your Honor. Okay, so isn't a plausible, isn't a reasonable inference from that that he intended not to make the payment to American Express? Well, then he continued to... He had access to the credit line that American Express provided? But then he continued to make payments to them. It was a timing issue. He made some payments, but not enough to cover. Well, because he... And he didn't, he missed by quite a bit, right? Well, yes, Your Honor. There was an amount that shortfalled... ...not infer that he was taking advantage of this lag in the payment. He got credit for it, but the payment didn't clear for three to seven days, and he took advantage of that. But, Your Honor, the argument is that doesn't show that the intent of the entire scheme was to defraud American Express. In fact, the argument is he was... Even if he was planning on paying it all back, if he came into money, but along the way, there's evidence that he was taking advantage of this system. And also along the way, there's some evidence that he lied, that he said things that weren't true. Well, Your Honor, he said things that he was going to make payments when he received payments, when he received money from the companies. And this continued during the whole entire spring. It was only in... Right. He said that he was going to make payments when he received money from the companies, but there was evidence that he had already received money from the companies, right? So, like in that example we just talked about, logistics had made a payment. It was in the account. It could have covered the debt to American Express, but he depleted the account before the debt was paid, right? Because he was using the money to try to keep the business operating, Your Honor. Some of it went for personal things as well, right? There was evidence that some of the money went to, not to keep the business going, but to his personal benefit, to his family's benefit. But those transactions happened after that period of these statements being made to American Express. The statements that are being made to America, the payments that were used to purchase the house in Fremont, the money that's being used to purchase the car for his wife, all happened after those initial statements were being made, not contemporaneous with them. Everything is being compressed here, Your Honor, to make it seem like everything is happening at once. But in fact, this is an ongoing series of transactions. They're saying to American Express that they're attempting to get bank loans to be able to make American Express whole. They're not contesting the loss. In fact, when American Express collection sues him, he doesn't contest it. There's a default judgment entered. And then before what would normally happen in this type of business, he seeks bankruptcy protection. It becomes a criminal investigation. The American Express turns it over to a retired detective who's working as one of their investigators. He calls the FBI. And now it's completely taken away from the collection process and becomes a criminal investigation. Your Honor, we also feel that the, and we argued that the, he did not receive a fair trial because the court permitted to test evidence of other act crimes involving Mandeep, defrauding, failing to make payments to Citibank, which came in to try to show intent. But at the time those charges were made on Mandeep's card, they were still in the process of trying to collect the money from the overseas customer. Wait, so, but if, in fact, the, he owes a debt to American Express and at that time he says, well, we can't use American Express anymore, but let's buy more iPhones on your personal card. Isn't that probative of whether he intended to pay back American Express? How is that? How is that, Your Honor? He's engaging, I'm not asking you, Your Honor, I'm trying to, it was rhetorical. Sorry, say that again? I said, my question wasn't to the court, it was rhetorical. I understand, I'm not offended, but if, in fact, you owe me a debt and you could pay me back, but instead you go buy more iPhones, isn't that probative of whether you intend to pay me back? Well, if he went and purchased an automobile with that money, yes, I think that might be, I would agree with you. But he went and he purchased products for the company that they're trying to generate revenues from those companies to pay back their debts. Well, did he have the opportunity to argue that, in fact, it doesn't show that I didn't want to pay back American Express, it shows that I wanted to build the company and eventually pay back American Express? They did make that argument. Okay, so then fine, so it could lead to either inference, right? But that means that it's probative of the question. I don't agree that it's probative of the question. He certainly wasn't denied the opportunity to trial to raise a defense, but that never should have come into the jury in the first place because it's not probative of what his intent was in the past. So it has no tendency to show that he didn't want to pay back American Express? I disagree, Your Honor. I think the fair inference from it was it was trying to keep the business operating. Again, if it had been used to purchase something extrinsic, if that had been used to make personal purchases, but no, it's used to make purchases for the business. Your Honors, I don't have time to touch upon, but we did argue that the employment special condition to the terms of supervised release was also improper, was overbroad and vague. The government defended by saying it wasn't right, but it will become right upon his release from prison. Yes, we know that. I mean, so what is this question about deportation? Do we expect that he would be deported upon release? I think in this administration, we don't know really what to expect. Certainly, he would be subject to deportation potentially, but he's not a violent crime. It's a financial crime. Might he be able to make an argument to be able to stay? He does have special needs children. He is anxious to take care of them. Judge Amen recognized that in imposing the sentence, and she imposed this broad condition, which will effectively prevent him from getting employment upon release. Why does it prevent him from getting employment if he just needs to coordinate with the probation office? Because the court did not provide any basis for what that coordination meant. So, the probation office can tell him not to take employment until he clears it. It just says consultation with probation, right? No, it says cooperation. Cooperation. Which basically means that... I mean, look, so why shouldn't he cooperate with the probation department? The probation department is going to try to help him find a job. That's what they do. Well, it's cooperation and investigation and obtaining employment. I mean, the conviction here is he's defrauding American Express because he had this scheme to buy a lot of iPhones, right, and then make a profit. So, if he said, I want to go work at American Express or at an Apple store or something, like, I don't know, shouldn't probation maybe know that he might get involved in the same kind of activity again? That's not unreasonable, but that's not the condition. If the condition was he could not take a job in a financial industry, that may be arguably reasonable. But here, it just appears to be arbitrary. It's given this entire control... So, what you're saying is that actually there's circumstances under which the condition is reasonable, but it could be applied in an unreasonable way. And so, doesn't that also suggest that the challenge is unripe? Like, if, in fact, the probation office, you know, applies it unreasonably, it prevents him from getting employment. Couldn't he then go back to district court and say this is an unreasonable application of the special condition? Well, your argument is that condition should have been reasonable. You're saying your argument is it's inherently unreasonable, but you just kind of just said there's a way it could be reasonable and there's a way it could be unreasonable. And I don't know if we should assume that the probation office is going to apply it in an unreasonable fashion. Well, I think in the case... I think in the cases we cite here is that this circuit has taken a position that the condition ought to be reasonable in the imposition. That, you know, there could also be... I mean, he could have a situation where he comes into tens of millions of dollars and never has to pay American Express off and never has to work. You said it would have been a reasonable condition if the condition was you can't work in the financial industry, right? Right. So wouldn't that be even more onerous than a condition that just says cooperate with the probation office when you seek paid employment? No, Your Honor. It's actually a ban on working in an entire industry. No, Your Honor, because it would be specific and it would be reasonably tied to the facts of the case as opposed to a broad prohibition. Okay. Thank you. Thank you very much, Mr. Tamayo. We'll hear from you again on rebuttal, but let's turn to the government, Mr. Gibaldi. Thank you, Your Honor. Good afternoon, and may it please the court. My name is Michael Gibaldi. I'm an assistant U.S. attorney in the Eastern District of New York, and along with my colleague P.J. Campbell, I represented the United States in the district court as well. Following a jury trial in 2022, the defendant Jasminder Singh stands convicted of one count of bank fraud and two counts of engaging in unlawful monetary transactions with the proceeds of his fraud. The evidence at trial proved overwhelmingly that this was not, as my colleague said, a case of a business failure, but that in late 2017 and early 2018, Jasminder Singh orchestrated a scheme to American Express of more than $4.7 million. One of the things that Jasminder Singh argued at trial, and what he frankly misrepresented to American Express on the reported phone calls that were played for the jury, is that this was all because his principal customer, Union Logistics, had stopped making timely payments. As we argued to the jury, and as the jury found, that was false. When Jasminder Singh said in late January 2018, it's all because I haven't received any payments, we put in front of the jury what's Government Appendix 59, a chart of all the payments from Union Logistics to Jasminder Singh's companies, showing that just in the several weeks prior, he had received almost $2 million. And so the idea that the principal customer stopped making payments was a defense that the jury clearly rejected based upon clear evidence showing otherwise. What the evidence did show is that as part of the fraud, Jasminder Singh lied to American Express to get more credit by making payments to American Express, which had the effect of instantly increasing his credit limit, which he used to buy thousands of Apple iPhones at a time. And then before those payments could clear, because there was a delay in the payment processing of about three days, he intentionally moved money out of the account that was making the payment to another account that he controlled, so that the payments to Amex bounced intentionally. And we had the testimony of cooperating witness Mandeep Singh, who said explicitly that in January 18, when he moved money from one quick wholesale account to a different account that Jasminder Singh controlled, the purpose of that transaction was to conceal the money from American Express. So the jury could certainly conclude on the basis of seeing the money come into Jasminder Singh's account, hearing Jasminder Singh on the phone making representations to Amex, seeing the actual money received in his TD Bank account, and then hearing Mandeep Singh describe after seeing the flow of money, how this was all designed to hide the money from American Express, that Jasminder Singh never had the intention of paying back American Express, and that this was also... What about the evidence that Mr. Tamao mentions about, well, he made some payments to American Express? Well, that was frankly part of our theory of the case, is that he was making certain payments to American Express to keep this fraud going for a longer period of time. Because if he simply never made any payments to American Express, he wouldn't have been able to get more iPhones. And so part of the scheme was make some payments, make additional payments that intentionally bounce and just sort of keep this going to get as many iPhones as possible that he can sell. And then as the jury saw, when the money did come in from Union Logistics, instead of paying back American Express, he did things like take that money and move it to... He used $1.3 million to buy a house, all cash in California. That was only several months after January 2018. That was in May and June of 2018. He withdrew... It just shows that he's trying to get the business to function so he can eventually pay back American Express. I mean, certainly a plausible argument that he made in the district court, but I think we made a different argument that it was probative of his fraudulent intent. Because the timing here is that those... When Mandeep Singh incurred those charges on the Citibank card, that was after American Express had begun calling Jasminder Singh and Mandeep Singh testified that it was at that point that Jasminder Singh told him to use the Citibank card. So our argument was, Jasminder Singh at this point certainly is on notice about problems with American Express and payment issues with American Express. And it's at that point that he tells his co-conspirator, hey, use a different credit card, which is at least probative of his fraudulent intent that he never intended to pay back American Express. And I think, frankly, the point that... But it's Mandeep's personal credit card, right? It's Mandeep's personal credit card, which Mandeep... Could he have used that money to pay back American Express anyway? Well, Mandeep said that he made... He used his personal credit card at Jasminder's direction to buy more... For business purposes. For business purposes. And he paid back the debt to American Express for business purposes, too. Right. And I think, frankly, the argument that there could have been a way to spin it that looked more favorable to the defense also just goes to the fact that this wasn't really all that prejudicial. And so Judge Ammon certainly didn't abuse her discretion in looking at the theory, the government's theory of how it was probative, balancing that against the risk of unfair prejudice, which, frankly, is pretty minimal here where the defense is even able to spin it in a way that is less inculpatory. The fact that it was so little money involved, it's $50,000 compared to the millions of dollars at issue with American Express, that this is just not the type of case where this court can conclude that Judge Ammon abused her discretion in admitting that evidence. I do just want to touch briefly, unless the court has any questions, other questions on sufficiency of the evidence, just because the supervised release condition came up as well. Yeah. What about the condition of supervised release? So do we know that he's going to get he will say there's extraordinary and unusual circumstances and so he's not going to be removed very quickly because that claim will be resolved? Like there could very well be a period of time in which he's seeking employment here, right? It's possible. I mean, certainly in the district court at sentencing, a big part of his argument is that he would certainly be deported because the crimes of conviction are... Did he object to this special condition? He did not object to this special condition and... It's a plain error. Correct. It would be subject to plain error review. The other thing is that I think just... But you're relying mainly on the idea that it's unripe, right? Right. Because I think... What if it's not unripe? So why is the condition reasonable? Well, I think as the court had asked my colleague and I think was coming out is that I think it's speculative to assume that it could be applied. I mean, whether it could be applied in a reasonable way or an unreasonable way. I mean, that's really our main argument in terms of ripeness is that... Well, the condition is only that he has to cooperate. Is that a problem? That he's required to cooperate with the probation department in the employment process? No, I mean, we certainly don't see a problem with that and I think certainly not something that constitutes plain error given that it wasn't objected to in the district court. Does it delegate too much discretion to the probation department? Could the probation department, as the opposing counsel suggested, just prohibit him from getting employment? Well, I think that... So the condition itself explicitly... So what it says... I'm just going to the condition itself. I have it. It says cooperate with the probation department in the investigation or approval of any employment. Right. So I think that the argument, as I understand it, is really going to the approval language as opposed to the investigation language. It implies that probation department has to approve of the employment. Correct. That's how I understand the argument. I think that's why we focus mainly on ripeness because what we have to assume is that, number one, he won't be deported, which is something that is not a certainty. And number two, that... So number one, he's not deported and number two, the probation department decides to apply this condition by denying him approval to work in a way that is unreasonable. And so those are the contingencies that would have to come into place before he would be affected by this condition. And so the better course in a case like this is simply to wait and see because he can always modify... move to modify this condition at a later point when it does actually become ripe and become not just a potential problem for him but an actual problem for him. Right. So the idea would be, well, at this stage, you know, he did engage in... or is convicted of fraud in the financial industry and related industries and so maybe there is a justification for consulting with the probation officer where he's going to end up being employed. But if the probation office uses that to, like, prevent him from working at all or to do so unreasonably, then that would be a separate problem. Like, there's something inherently wrong with the condition but maybe the application could be unreasonable. Certainly. And he would always have the right to... If he thought that the condition itself just obviously is unreasonable inherently, then we could review it now. But you're just saying there's something inherently wrong with it that his challenge is really to an expected unreasonable application. Yes, Your Honor. I think unless the court has any additional questions, we ask that the court affirm the judgment in all respects for the reasons set forth in our papers. Thank you. Thank you very much, Mr. Tribaldi. We'll turn back to Mr. Tumau on rebuttal. Thank you, Your Honors. A couple of points, Your Honors. Number one, the issue about plain error, what plain error applies to the employment condition issue. Yeah, there's also a standard condition, a standard which apparently there's no objection to. The standard condition is you must work full time at a lawful type of employment unless the probation officer excuses you from doing so. In other words, there's an obligation to get employment unless the probation officer says no. Right. And we argued in our main brief that because of that, there wasn't a need for this special condition the way it was written and there was no clear reason to support it. It was also not something that the probation department asked for in the pre-sentence report. That was not something that they were seeking and therefore, Mr. It just doesn't strike me as anything that's unusual. Well, it's not a... It's doing many of these judgments. I understand, Your Honor. I understand. Our concern is in the way it's written that it's overbroad and that it could cause problems. It's overbroad because you don't like the fact that implicitly the probation department has the right of approval. Yes, Your Honor, and it extends what's in the standard condition that you just quoted, which we did not object to about getting employment that has to be lawful and that unless he's excused from getting employment by the probation department and what doesn't seem to have a clear point. I did want to go back, Your Honor, and just describe one other thing and that is, as my colleague here was describing the crime, it made it sound... He gave a description of a classic bust-out, except the facts don't fit the classic bust-out. This was not a situation in which he was making payments in order to get additional credit. In fact, American Express cut off his credit at the very... When these payments were made back in February of 2018. The payments that he made subsequent to that did not... were not for the purpose of getting additional credit. It was to pay off the prior credit. In years past, over the six or seven years that he did business with American Express, he did build up a substantial amount of credit based upon his timely payments, and those payments were all made, you know, except for a couple situations that were resolved, and American Express received full payment for everything they had. Unless Your Honors have any further questions, we'll rest on our papers. Thank you very much, Mr. Tamao. The case is submitted.